**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| MATTIE HALL, | : | |
| Plaintiff, | : | |
| | | Case No. 3:07CV0228 |
| vs. | : | |
| | | District Judge Thomas Rose |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATIONS[1]**

**I.    INTRODUCTION**

Plaintiff Matti Hall worked for more than 20 years as a housekeeping supervisor at Wright-Patterson Air Force Base. (Tr. 70). She began suffering seizures in 2001, but she continued to work until she had a seizure at work in August 2003.

On September 8, 2003, Plaintiff sought financial assistance from the Social Security Administration by applying for Supplemental Security Income (SSI) (Tr. 474-76) and Disability Insurance Benefits (DIB) (Tr. 52-54). In both applications she asserted a disability onset date of August 7, 2003.

After initial administrative denials of her DIB and SSI applications, Administrative Law Judge (ALJ) Thaddeus J. Armstead Sr. held a hearing. The ALJ later denied

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff's applications based on his conclusion that Plaintiff was not under a "disability" within the meaning of the Social Security Act. (Tr. 26). The ALJ's nondisability determination and the resulting denial of benefits became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks a remand to the Social Security Administration to correct certain errors committed by the ALJ in analyzing her SSI and DIB applications. The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

### A. Plaintiff and Her Testimony

At the time of the ALJ's decision, Plaintiff's age (46) placed her in the category of a "younger person" for purposes of resolving her DIB and SSI applications. *See* 20 C.F.R. §§404.1563(c), 416.963(c). She has a ninth or tenth grade education. (Doc. #8 at 3).

Plaintiff testified during the ALJ's hearing that her medical problems preventing her from working are seizures and severe pain due to arthritis in her neck, shoulders, and legs. (Tr. 504).

Plaintiff testified that was uncertain how often she has a seizure but she estimated up to 3 times per month. (Tr. 505, 507). Sometimes a seizure will occur when she is talking on the telephone. She explained, "when they're talking to me on the phone I just space out or I don't say anything or, and when I do come back to them I don't remember anything. I don't remember anything that we said, or anything that we talked about." (Tr. 507). A seizure will last anywhere between a few seconds to 1 minute and can occur 3 or 4 times a week. (Tr. 507, 518). Plaintiff has other types of seizures when she spaces out and grabs something close to her and "goes into a staring motion...." (Tr. 517). After a seizure, she is tired and sleeps for a while. (Tr. 518).

Plaintiff has diabetes and takes insulin. (Tr. 510, 520). She described her control of diabetes as "up and down." (Tr. 510, 520-21). She also has neuropathy in her legs and feet. (Tr. 510, 520). Neuropathy causes constant numbness in her left leg and foot. She estimated that the daily pain in her legs is at the severity level of 8 or 9 on a 10-point scale (0 equaling no pain; 10 equaling the worst imaginable pain). (Tr. 519). Plaintiff also has back pain and headaches at the same level of severity. (Tr. 521, 523). Plaintiff does not lift anything more than a sheet of paper or a bottle of soda because lifting causes her pain. (Tr. 521, 524-25).

Plaintiff's activities at home include very little cooking; she does not iron clothes, wash dishes, sweep, vacuum, wash clothes, shop, attend movies, engage in hobbies, exercise, or go on vacations. (Tr. 511-12). She does not visit with friends but her family visits her. She attends church "every now and then." (Tr. 512). She spends a typical day

mostly staying in her room watching television or napping. (Tr. 512-13). Plaintiff explained that she stays in her room because she is "depressed with life." (Tr. 513). Plaintiff also testified that she takes 14 different medications every day. (Tr. 514).

Numbness in one leg and pain in both legs prevent Plaintiff from walking more than ½ to 1 block. (Tr. 514). She can walk inside her house but does not walk a lot outside because she falls. (Tr. 515). She can stand for probably 20 minutes at most and then must sit. She can sit for ½ to 1 hour. *Id*.

Plaintiff's sister also testified during the ALJ's hearing. (Tr. 527-31). According to Plaintiff's sister, when Plaintiff has a seizures, she "gets rigid. She's unable to control her muscles and she gets real tight...." (Tr. 528). A seizure lasts about 1 or 2 minutes. Plaintiff is tired and usually sleeps after she has a seizure. *Id*. Plaintiff's sister also testified that Plaintiff has been depressed since she stopped working. (Tr. 530).

### B. Medical Source Opinions

Plaintiff relies on the opinions of her treating physician, Dr. Kadakia, who treated her from at least September 2001 through October 2004. (Doc. #8 at 13). Dr. Kadakia completed a two-page form in April 2004 for the Montgomery County Department of Job and Family Services. (Tr. 317-18). Dr. Kadakia listed the following diagnoses: (1) insulin-dependent diabetes mellitus; (2) seizure disorder; (3) congestive heart failure; (4) GERD (gastroesophageal reflux disease); (5) depression; and (6) back pain. (Tr. 317). Dr. Kadakia noted that Plaintiff had a history of these problems "on and off for the last 5 years." *Id*. Dr. Kadakia opined that Plaintiff could stand/walk for 2 hours during an 8-

hour workday; she could sit for 2 hours during an 8-hour workday; she could lift up to 5 pounds frequently or occasionally; and she was extremely limited in her ability to push/pull, bend, reach, and engage in handling or repetitive foot movements. (Tr. 318). Dr. Kadakia explained that neuropathy, seizure disorder, and back pain caused Plaintiff's limitations. *Id*. Dr. Kadakia also checked a box indicating his opinion that Plaintiff was "unemployable." (Tr. 318).

Plaintiff also relies on the opinion of her treating psychiatrist, Dr. Pasha, who answered written interrogatories in March 2006 after treating Plaintiff for two years. (Tr. 450-59). Dr. Pasha began treating Plaintiff on February 18, 2004 and her last visit occurred on March 14, 2006. (Tr. 450). Dr. Pasha explained that Plaintiff's depression and anxiety, combined with her multiple physical problems, intensified both her physical and mental impairments. He explained this as follows:

> The perception of pain is substantially influenced not only by accumulated physical problems causing pain, but also by severity of emotions of depression, anxiety, panic attacks, fears and insecurity. On the other hand, the perception of emotional suffering are considerably intensified by on-going chronic pain and as a result there is an intensification of both physical and emotional symptoms.
>
> However, her personality make up has been healthy enough not to have any impact on her ability to maintain gainful employment for 32 years. It is the loss of ability to work plus development of multi-system physical problems within a short period of time that have played a heavy toll on her body and psych without any impact originating from underlying personality traits.

(Tr. 453). Dr. Pasha also checked answers indicating his opinion that Plaintiff had no ability to perform many mental work activities. (Tr. 453-59). He explained, "The

5

chronic pain plus anxiety and depression substantially impact adversely her cognitive functions, especially the ability to maintain attention, immediate memory on a consistent basis. This makers her very unreliable, unpredictable and no longer suitable for any kind of work functions...." (Tr. 454).

The Commissioner contends that the ALJ did not err by declining to rely on Dr. Pasha's March 2006 opinions and by instead choosing to rely on Dr. Pasha's earlier, initial evaluation of Plaintiff in April 2004. (Doc. #10 at 16). Dr. Pasha initially diagnosed major depression, recurrent, without psychotic features. (Tr. 279). He checked boxes on this form observing that Plaintiff appeared well groomed; her demeanor was cooperative; she engaged in direct eye contact; she was agitated; her speech was clear; she had no delusions or hallucinations; her thought process was logical; her mood was depressed, anxious, and irritable; her behavior was cooperative and restless; and her affect was full. (Tr. 278-79). Dr. Pasha assessed Plaintiff's then-current GAF at 55, generally indicating a person with "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."[2] Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34 ("DSM-IV-TR").

---

[2] GAF," or Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed. Appx. 191, 194 n.2 (6th Cir. 2003); *see also* DSM-IV-TR at 32-34.

The Commissioner also relies on Dr. Olson's report concerning his consultative examination of Plaintiff in March 2004.  (Tr. 136-40).  Dr. Olson diagnosed adjustment disorder with depressed mood.  (Tr. 140).  He assessed her then-current GAF at 61, generally indicating a person with "[s]ome mild symptoms ... or moderate difficulty in social, occupational, or school functioning ... but generally functioning pretty well...." DSM-IV-TR at p. 34.  Dr. Olson further concluded:

1. Plaintiff's mental ability to relate to others, including coworkers and supervisors, was mildly impaired due to depressed mood;

2. Her mental ability to understand, remember and follow instructions was unimpaired;

3. Her mental ability to maintain attention, concentration, and task persistence was unimpaired during the clinical interview.  Her ability to maintain the pace of a competitive job environment may be mildly impaired by her depressed mood; and

4. Her mental ability to withstand stress and pressures associated with day-to-day work activity may be mildly impaired.

(Tr. 140).

### III.  ADMINISTRATIVE REVIEW

#### A.  "Disability" Defined and the Sequential Evaluation Process

The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that

7

is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[3] Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

    1.    Is the claimant engaged in substantial gainful activity?

    2.    Does the claimant suffer from one or more severe impairments?

    3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

    4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

    5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

---

[3] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations. Plaintiff met the insured-status requirement for DIB eligibility through December 31, 2009. *See Colvin*, 475 F.3d at 730.

F.3d 348, 354 (6th Cir. 2001).

    **B.    The ALJ's Decision**

At Step 2 of the sequential evaluation, the ALJ found that Plaintiff has the following severe impairments: seizure disorder, vertebrogenic disorder with right lower extremity pain, obesity, diabetes mellitus, headaches, and an adjustment disorder with depressed mood. (Tr. 16).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or a combination of impairments that meet or medically equal an impairment in the Listings. (Tr. 17).

At Step 4, the ALJ assessed Plaintiff's Residual Functional Capacity at a limited range of light exertional work with certain physical work restrictions and the following mental work restrictions:

> [T]he claimant is limited to simple, repetitive tasks without complex or detailed instructions which did not require concentration longer than 15 minutes on a single task involved in a project; may have occasional contact with co-workers and supervisors, but no contact with the general public as a work requirement; and is limited to tasks featuring low pressure for production (for example, using a ten-point scale to pleasure pressure for production and pace, with ('zero' or 'one') representing the least pressure for production and pace and 'ten' representing the greatest pressure for production and pace, the claimant would be limited to performing duties at a level of 5).

(Tr. 20). The ALJ also determined at Step 4 that Plaintiff could not perform her past relevant work. (Tr. 24).

The ALJ's assessment of Plaintiff's Residual Functional Capacity as well as the

9

ALJ's additional findings in Steps 1 through 5 of his sequential evaluation, led him to conclude that Plaintiff was not under a disability, and as a result, she was not eligible for DIB or SSI.  (Tr. 25-26).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria."  *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "more than a scintilla of evidence but less than a preponderance..."  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Secretary of Health and Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994). And the required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence."  *Rogers*, 486 F.3d at 241 (citing *Her*, 203

F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.  DISCUSSION

Plaintiff contends that the ALJ erred by failing to mention, let alone articulate his reason for rejecting, the opinions of her treating physician Dr. Kadakia.

The Commissioner contends that the ALJ's failure to discuss Dr. Kadakia's opinions was harmless error, if error at all since courts have found that ALJs are not expected to analyze every report in the record. (Doc. #10 at 11-13). Harmless error occurred, according to the Commissioner, because Dr. Kadakia did not perform significant testing, because he had only a sporadic relationship with Plaintiff, and because the record is voluminous and detailed in light of the many doctors and counselors Plaintiff has seen.

The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a nonexamining medical advisor or an examining physician who saw a claimant only once

11

or a medical advisor who testified before the ALJ. *Wilson*, 378 F.3d at 544; *see Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)).

The ALJ erred by failing to evaluate the opinions provided by her treating physician Dr. Kadakia. The Regulations explain generally, "We will evaluate every medical opinion we receive...." 20 C.F.R. 416.927(d). Specifically as to treating medical source opinions, the Regulations require ALJs to provide good reasons for rejecting a treating physician's opinion. *See Wilson*, 378 F.3d at 544-45. The Regulations mandate, "We will always give good reasons for in our notice of determination or decision for the weight we give you treating source's opinion." 20 C.F.R. §416.927(d)(2). The ALJ's

failure to mention Dr. Kadikia's opinion thus constituted an error of law. *See Bowen*, 478 F.3d at 747 ("The key problem with the ALJ's decision ... is that it completely fails to acknowledge the expert opinion of Dr. Holean, Bowen's treating psychologist."); *see also Wilson*, 378 F.3d at 544-45.

The Commissioner's contention that this error was harmless lacks merit. Although Dr. Kadakia's opinions appear in a two-page form (Tr. 317-18), a review of the information he provided therein does not reveal that his opinion was so "patently deficient that the Commissioner could not possibly credit it...." *Wilson*, 378 F.3d at 547. The ALJ's decision does not contain some other ground for finding harmless error. For example, the ALJ did not make findings consistent with Dr. Kadakia's opinions, and neither the record nor the ALJ's decision otherwise indicates a situation where the goals of the regulatory "good reason" requirement were met despite the ALJ's failure to discuss Dr. Kadakia's opinions. *See Wilson*, 378 F.3d at 547-48.

The Commissioner points out that Dr. Kadakia's treatment of Plaintiff has been sporadic because Dr. Kadakia noted that he had seen Plaintiff "on and off for the last five years." (Doc. #10 at 11)(citing Tr. 317). This point, however, misconstrues the form completed by and information provided by Dr. Kadakia. In the form, below where Dr. Kadakia listed his diagnoses, appears a space for Dr. Kadakia to set forth the "history of these problems...." (Tr. 317). Dr. Kadakia noted in this space, "on and off for last five years." *Id*. (emphasis in original). The plain meaning of this note at most means what it says – that the health problems Dr. Kadakia had listed in his diagnoses arose "on and off

13

for the last five years." *Id*. Without a more specific indication of intermittent treatment by Dr. Kadakia, it is not reasonable to interpret this note against Plaintiff – at least when assessing whether the ALJ committed harmless error – to mean the Dr. Kadakia only provided her with sporadic treatment.

The Commissioner also points to other purported deficiencies in Dr. Kadakia's opinions in an attempt to show harmless error. In doing so, however, the Commissioner merely provides the type of analysis that the Regulations demanded of the ALJ. "A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record to discount the treating physician's opinions, and thus a different outcome on remand is unlikely. '[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway.'" *Wilson*, 378 F.3d at 546 (citations omitted)(brackets in *Wilson*).

Turning to Dr. Pasha's March 2006 opinions, Plaintiff argues that the ALJ applied the wrong standard when evaluating this treating psychiatrist's opinion. Plaintiff reasons that the ALJ misapprehended Dr. Pasha's opinion, which was not based on Plaintiff's pain but was instead based on her perception of pain. (Doc. 8 at 17). Plaintiff emphasizes that Dr. Pasha found her perception of pain "'substantially influenced not only by accumulated physical problems causing pain, but also by severity of emotions' stemming from depression and anxiety." *Id*. (quoting in part Tr. 453).

The Commissioner contends that the ALJ properly relied on Dr. Pasha's initial

14

evaluation of Plaintiff in 2004, which was more consistent with the treatment notes over the next two years – referring to Plaintiff as stable.  The Commissioner further contends that the ALJ correctly noted that Dr. Pasha did not treat Plaintiff's physical problems and questioned whether he even had access to Plaintiff's medical record regarding her physical problems.  The Commissioner also maintains that Plaintiff's treatment records reveal, contrary to her contentions, that her perception of her pain is overstated.  Lastly, the Commissioner contends that the ALJ properly relied on the opinion of one-time evaluator, Dr. Olson.

The ALJ rejected Dr. Pasha's opinion in part as follows: "While Dr. Pasha is [a] psychiatrist, he does not treat, and there is no indication that he has access to her medical records concerning, the claimant's physical problems."  (Tr. 22).  Accepting this point as accurate does not assist the Commissioner because it reveals – as Plaintiff correctly contends – that the ALJ misapprehended Dr. Pasha's opinions.  Dr. Pasha provided clear, cogent, and detailed explanations in support of his March 2006 opinions. *See* Tr. 451-55. He did not base his opinions on Plaintiff's physical pain by itself, but instead considered the combination of her impairments both mental and physical.  Dr. Pasha wrote, for example, "The perception of pain is substantially influenced not only by accumulated physical problems causing pain, but also by severity of emotions of depression, anxiety, panic attacks, fears and insecurity." (Tr. 453).  By emphasizing that Dr. Pasha lacked access to Plaintiff's medical records, the ALJ erred by considering separately her physical and mental impairments rather than in combination as Dr. Pasha did.  *See Walker v.*

15

*Secretary of Health and Human Servs.*, 980 F.2d 1066, 1071 (6th Cir. 1992)(citing 20 C.F.R. §404.1523); *see also* 20 C.F.R. 416.923 ("we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity....").

      The ALJ also rejected Dr. Pasha's March 2006 opinions because they appeared in answers to interrogatories provided by Plaintiff's counsel and because the ALJ apparently believed that Dr. Pasha held a motive to assist Plaintiff in obtaining benefits rather than presenting an accurate medical opinion about the severity of her impairments. *See* Tr. 22. These, however, are not factors specifically set forth under the treating physician rule or the remaining factors set forth in the Regulations. The ALJ's belief in Dr. Pasha's improper or misdirected motives overlooks the significance the Regulations generally place on treating physician opinions. "The purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them. An examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner.... The [Commissioner] may not assume that doctors routinely lie in order to help their patients collect disability benefits." *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1996) (citation and punctuation omitted).

      In addition, the Regulations state, "Generally, we give more weight to opinions from your treating source, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairments...." 20 C.F.R. §416.927(d)(2). Moreover, the treating physician rule "is based on the assumption

that a medical professional who has dealt with a claimant and has his [or her] maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *see Walker*, 980 F.2d at 1070-71. In other words, the observation that Dr. Pasha did not initially understand the severity of the combination of Plaintiff's multiple medical problems does not belie his later assessment – made after two years of treatment – indicating that her impairments were more severe than he initially appreciated.

Accordingly, for all the above reasons, Plaintiff's Statement of Errors is well taken.

## VI. REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Plaintiff does not seek a judicial award of benefits and none is warranted, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above. On remand, the ALJ should be directed to (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; (2) obtain the opinions of a medical expert pursuant to 20 C.F.R. §§404.1527(f)(2)(iii), 416.927(f)(2)(iii); and (3) reconsider, under the required sequential evaluation procedure, whether Plaintiff is under a disability and thus eligible to receive DIB and/or SSI.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's final non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Mattie Hall was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.

August 20, 2008

                                                            s/ Sharon L. Ovington
                                                              Sharon L. Ovington
                                            United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).